Grace O. Dean v. Commissioner.
Dean v. Commissioner
Docket No. 39021.
United States Tax Court
T.C. Memo 1955-217; 1955 Tax Ct. Memo LEXIS 122; 14 T.C.M. (CCH) 859; T.C.M. (RIA) 55217; July 29, 1955
*122 Grace O. Dean, 2922 Pleasant Avenue, Minneapolis, Minn., pro se. Richard C. McLaughlin, Esq., for the respondent. TURNER
Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax against petitioner for the years 1946 and 1947 in the amounts of $1,309.89 and $2,433.84, additions to tax for the said years for fraud in the amounts of $654.95 and $1,216.92, and a 25 per cent addition to tax of $608.46 for the year 1947, for failure to file a timely return. The questions for decision are (1) to what extent, if any, the respondent's determination of income by "analysis" of petitioner's bank deposits and cash expenditures is in error; (2) whether the deficiencies, if any, were due to fraud with intent to evade tax; and (3) whether petitioner's failure to file a timely income tax return for 1947 was due to reasonable cause and not to willful neglect. Findings of Fact Petitioner is an individual, and resides in Minneapolis, Minnesota. She filed both a timely original income tax return and an amended return for 1946 and a delinquent return for 1947 with the collector of internal revenue for the district of Minnesota. *123 At the beginning of 1946, petitioner owned and operated a small grocery store, which was located in Minneapolis. She had purchased the store in 1944 for a total cost of $1,919.20, $1,300 of the purchase price being regarded as in payment for the business and fixtures, with the remainder being attributed to inventory. The full purchase price had been paid by February of 1945. She and her son Darryl, who attained his seventeenth birthday on May 23, 1946, lived in an apartment above the store. In April of 1946, petitioner sold the store for $2,850 cash. In making the sale, no allocation was made of the selling price as between fixtures, equipment and inventory. About the middle of May 1946, petitioner went to the Mayo Clinic, in Rochester, Minnesota, where she underwent an operation for cancer. She returned from Rochester in approximately three weeks, but was unable to work during the remainder of the summer. Periodically, she was required to return to the clinic for examination and treatment. In connection with the operation and treatments, she expended approximately $1,000, of which an undisclosed amount was covered by insurance. In 1946, Kenneth A. Cronstrom was erecting a *124 business building in a section of Minneapolis which was partly residential but which was generally regarded as a new industrial area. A part of the building was to be occupied by the Cronstrom Sheet Metal Shop. It was also to include space for a restaurant or coffee shop. Petitioner had become interested in the possibility of a coffee shop operation and Cronstrom agreed to rent the restaurant space to her. After the sale of the grocery store in April, petitioner and her son had continued to occupy the apartment over the store, but in August or September of 1946, she learned of a small residence on the opposite side of the street from the coffee shop site which was for sale and, because of its location, she took immediate steps to acquire it. She planned to obtain most of the money required from her three brothers, but they lived elsewhere, and due to a need for acting promptly, she made arrangements for financial assistance from A. F. Butts, an acquaintance of several years. The purchase price of the property was $7,150, of which $1,150 was paid by petitioner and the remaining $6,000 by Butts. After acquisition of the residence, and in 1946, petitioner expended an additional amount, *125 possibly as much as $1,500, for renovating the property and making it livable. During 1947 she repaid $5,000 of the $6,000 which had been advanced by Butts. The down payment, the amount paid for renovation and repayments to Butts were from non-income items in the form of loans, chiefly from her three brothers, and from a fund left to her by her father for the benefit of her son. In the fall of 1946, and as early as October, petitioner took over and began to equip the restaurant in the Cronstrom Building. It was located at 4223 Hiawatha Avenue and was known as the Hiawatha Coffee Shop. When completed it could seat 80 people. In equipping the coffee shop, petitioner again had the financial assistance of Butts. The initial purchases of equipment had a total cost of $8,711.50 and Butts advanced the full amount paid to the suppliers therefor. As between petitioner and himself, however, he had a conditional sales contract drawn up and executed under date of October 31, 1946, showing A.B.C. Motor Sales as the seller of the equipment, with petitioner as the purchaser. The contract recited a down payment of $2,711.50 and a deferred balance of $6,000. "Insurance and Finance Charges" of $740 *126 were added, indicating the balance owing by petitioner under the contract as $6,740, which balance was to be paid in eleven monthly payments of $200 each, beginning on December 10, 1946, with a final payment of $4,540 to become due on December 10, 1947. On November 1, 1946, Butts sold the contract to the Northern Finance Company, receiving $6,020 therefor. The net result was that petitioner had acquired $8,711.50 worth of equipment, for which she still owed the full amount, $2,711.50 to Butts and $6,000 to Northern Finance Company and in addition she owed the latter $740 for financing charges. In the purchase of the above equipment, Butts made most of the payments directly to the suppliers, but as to $1,643.52, he issued a check to petitioner and she in turn paid the suppliers. At least two of the items so purchased by her but for which she remained obligated under the conditional sales contract were paid for by checks drawn on her bank account, the two items being the frigidaire, $600costing, and the venetian blinds, costing $63. Another item included in the conditional sales contract, at $300, and paid for by check on petitioner's bank account, was a coffee shop sign, which actually *127 cost $350. The Northern Finance Company, on November 11, 1946, and January 14, 1947, charged petitioner with insurance premiums of $10.40 and $67.32. These premiums were paid by petitioner on January 16, 1947, by checks drawn on her bank account. The petitioner paid the first of the $200 installments on December 12, 1946, and the remaining ten such payments in 1947. Petitioner began the operation of the coffee shop on November 1, 1946, and continued its operation until November 1947, when the business, including the fixtures and equipment, was sold for $9,100. Of that amount, $4,547.60 was paid directly to the Northern Finance Company to cover the balance due under the conditional sales contract, described above; $1 was paid for recording satisfaction of that contract; $450 was paid as commission on the sale; $275 was paid to Cronstrom for rent due up to December 1, 1947; and $251.93 was paid to Cronstrom for materials and labor furnished petitioner in the course of her operation of the coffee shop, with petitioner receiving net the balance of $3,574.47, which amount was deposited in her bank account on December 1, 1947. Of the net amount so received, $2,306.34 was immediately *128 disbursed by check to cover coffee shop obligations, one market alone receiving $1,134. After the repayment in 1947 of $5,000 of the $6,000 which Butts had loaned to her in the purchase of the residence, petitioner was still indebted to him for $6,000, and on or about May 10, 1947, she gave him a note for that amount. In 1948, her obligation to Butts was satisfied in full. In consideration of her conveyance of the residence to him, Butts satisfied the note and in addition paid petitioner $1,500 in cash. In her original return for 1946, petitioner reported a profit from the operation and sale of the grocery store of $1,376.42 and a loss of $1,949.64 from the operation of the coffee shop, or a net loss for the year of $573.22. In her amended 1946 return, filed in May or June of 1950, she reported a profit of $327.28 from the operation of the grocery store and a long-term gain of $722.06 from its sale, 50 per cent of which, or $361.03, was reported as taxable. In the same return, she reported a loss of $1,902.03 from the operation of the coffee shop, or a net loss for the year of $1,213.72. With respect to the operation of the grocery store, it was disclosed in the amended return *129 that petitioner's records were incomplete and that as to sales, purchases and expenses, with the exception of amounts paid for light, power and telephone, and the amount charged for depreciation, the amounts reported were estimated amounts based on the operations for the year 1945. After the close of 1947, petitioner, to the best of her ability, made up a statement covering the operation of the coffee shop during that year, which statement she turned over to an accountant, who, according to her understanding, was qualified to advise her in the matter of preparing her income tax return. After examining the data submitted, the accountant advised that a 1947 return would not be required of her. In April of 1950, and in the course of an investigation of the income of A. F. Butts, petitioner was questioned by agents of the Bureau of Internal Revenue. She was advised that the investigation had to do with the tax liability of Butts, and did not relate to her. In the course of the questioning, she told of the loan of $6,000 from Butts in connection with the purchase of the residence in 1946 and that she had repaid $5,000 of that loan with money borrowed from her brothers. She also told *130 of the financial aid Butts had given her in the equipping of the coffee shop. Based on these disclosures, the agents decided to check the sources of petitioner's funds and the reporting of income by her, and one of the agents proceeded with that investigation. That course of events caused petitioner to consult a second accountant, who prepared the 1946 amended return, descirbed above, and the 1947 return, which was belatedly filed on or shortly prior to June 7, 1950. In the 1947 return, petitioner reported $28,096.37 as the sales made in the coffee shop operation during the year, expenses, including food purchased, amounting in all to $33,515.93, and a net loss from operations of $5,419.56. She reported $10,673.68 as the total cost of the fixtures and equipment acquired and used in the coffee shop and claimed depreciation thereon at 10 per cent. The total of the depreciation claimed during her ownership and operation of the coffee shop was reported at $1,081.49, of which $157.93 was claimed for 1946 and $923.56 for 1947. With respect to the sale of the coffee shop, she showed $9,592.19 as her adjusted basis for fixtures and equipment, the selling price as $9,100, less $451 for commission *131 and recording, or a net selling price of $8,649, and a net loss on the sale of $943.19. She reported a net loss for the year of $6,362.75. In making his investigation, the revenue agent as to both 1946 and 1947 concluded that petitioner in her returns had gratly understated her income and that her books did not correctly reflect her receipts from business. As to receipts or sales, he thereafter ignored the record which had been maintained by petitioner covering her coffee shop operations and made his own reconstruction of "business receipts" by what he termed an "analysis" of her bank deposits and her "cash paid outs," which latter category was designed to cover the expenditures made from moneys received but which were expended without having passed through her bank account. From the aggregate of bank deposits, plus "cash paid outs," he deducted what he concluded were the amounts of deposits and cash received "not representing business income," to arrive at his determination of "Net Business Receipts, as Corrected." From the "Net Business Receipts, as Corrected," determined as stated, he deducted the purchases and business expenses as claimed by petitioner in her returns [1] to arrive *132 at what he determined to be her "Net Business Income as corrected." The revenue agent's determination of petitioner's "Net Business Income as corrected" for 1946 was as follows: Deposits: Lincoln Office Northwestern National Bank
$ 3,514.83
First Bloomington Lake National Bank
5,084.72
$ 8,599.55
Add: Cash Received But Not Deposited: Living expenses paid in cash
$ 1,500.00
Cash paid by taxpayer in purchase of house
650.00
Cash paid for remodeling house
1,500.00
Cash paid on equipment mortgage
2,711.50
Purchases and other business expenses paid in cash: Summit Grocery: Total (per original return)
$ 4,556.25
Paid by check
395.55
Paid by cash
4,160.70
Hiawatha Coffee Shop: Total (per amended return)
$ 8,074.74
Paid by check
3,187.30
Paid by cash
4,887.44
Total cash paid outs
15,409.64
Total deposits and cash paid outs
$24,009.19
Less: Total Deposits and Cash Received, Not Representing Business
Income: Loans from A. F. Butts: In November, 1946
$ 2,243.52
In December, 1946
500.00
Selling price of store fixtures and equipment
1,750.00
Total deposits and cash received not representing business income
4,493.52
Net business receipts, as corrected
$19,515.67
Less "deductible expenses"
12,788.92
Net business income as corrected, year 1946
$ 6,726.75
*133 The revenue agent's determination of petitioner's "Net Business Income as corrected" for 1947 was as follows: Deposits: First Bloomington Lake National Bank
$15,935.76
Cash Paid Outs: Living expenses
$ 1,500.00
To A. F. Butts on house loan
5,000.00
To Northern Finance Company on chattel mortgage
400.00
Purchases and Other Deductions Paid by Cash: Purchases and other deductions claimed in
return
$33,515.93
Less depreciation and personal property
tax deductions
1,185.43
Net deductions paid in 1947
$ 32,330.50
Less portion of above deductions paid by
check
6,997.77
Purchases and other deductions paid by cash
25,332.73
Personal cash withdrawals and cash given to Darryl per
daily record book
281.32
Equipment paid for in cash in 1947
1,575.90
Items shown as purchases of equipment in books, pay-
Ment of which was made in cash
116.43
Total cash paid outs
34,206.38
Total deposits and cash paid outs
$50,142.14
Less: Total Deposits and Cash Received, Not Representing
Income: Loans from A. F. Butts, per bad debt deduction claimed
in his 1947 return
$ 1,500.00
Net amount received from sale of restaurant and de-
posited by the taxpayer
3,574.47
Loans from others (brothers, etc.)
None
Refund of income taxes (federal)
100.00
Total deposits and cash received, not income
5,174.47
Net business receipts, as corrected
$44,967.67
Less Deductions Allowed Herein: Deductions per return
$33,515.93
Less deduction disallowed herein: Personal property tax deduction
261.87
Deductions allowed herein
33,254.06
Net business income as corrected
$11,713.61
*134 Respondent in his determination of the deficiencies herein accepted the revenue agent's determination of "Net Business Income as corrected" for each of the years involved. As to 1946, he concluded that the taxable capital gain realized on the sale of the grocery store was $336.03, instead of $361.03, as reported by petitioner, and after allowing a standard deduction of $500, determined that petitioner's net income for the year was $6,562.78. In computing the tax, he allowed an exemption of $500 for petitioner, but allowed no dependency credit for her son Darryl. For the year 1947, he allowed the loss of $943.19 on the sale of the coffee shop, as claimed by petitioner in her return, and after allowing a standard deduction of $500, determined that petitioner's net income for the year was $10,270.42. In computing the tax, he allowed an exemption of $500 for petitioner, but allowed no dependency credit for Darryl. Petitioner's net income, if any, for each of the years 1946 and 1947 did not exceed the statutory exemption or exemptions allowable to her and there was no net income to support the determination of a deficiency in tax for either year. And it accordingly follows that no part *135 of any deficiency was due to fraud with intent to evade tax. Further, petitioner's failure to file a timely income tax return for 1947 was due to reasonable cause and not to willful neglect. Opinion This is an unhappy case and one which should not have been. The petitioner had only two possible sources of income in 1946 and 1947, namely, the grocery store and the coffee shop, and the respondent has not contended, concluded or determined otherwise. And, while a few hundred dollars may have been earned net from the grocery store during the approximately 3 1/2 months of 1946 it was owned and operated by petitioner and something over $300 of gain realized on its sale, as the petitioner reported in her original and amended 1946 returns, the evidence of record convincingly shows that the coffee shop was, on the other hand, a failure, and after approximately two months of operation in 1946 and 10 1/2 months in 1947 it was sold for substantially less than the depreciated cost of the fixtures and equipment. In short, it was only through the use of borrowed money that petitioner was able to continue the coffee shop operation as long as she did. And yet the revenue agent, by his "analysis" *136 of bank deposits and "cash paid outs," arrived at "net business income" for petitioner of $6,726.75 and $11,713.61 for the said years, and the respondent, adopting the revenue agent's findings, has determined that petitioner had a net income of $6,562.78 for 1946 and $10,270.42 for 1947, with deficiencies in tax for the said years, as above stated, and further that the deficiencies were due to fraud with intent to evade tax. It is true that petitioner's records were not maintained in an approved manner. They were apparently incomplete and in the circumstances the respondent in his determination was justified in adopting some method which would as nearly as possible correctly reveal petitioner's taxable income, if any. The absence of complete recorded entries, however, does not justify his ignoring the obvious or excuse a failure to weigh and consider objectively the information and data which is supplied or otherwise available to him. The petitioner, being unable to employ counsel to represent her at the trial, appeared in her own behalf and though she was handicapped through inexperience and lack of understanding of the revenue agent's "analysis" of her bank deposits and "cash *137 paid outs," she did produce such papers, canceled checks and other documents relating to her operations in the taxable years as remained available to her and to the best of her understanding testified orally with respect to those operations and the results thereof. We have examined the evidence of record in light of the conclusions of the revenue agent, which conclusions were accepted by the respondent in his determination of deficiencies herein, and from the evidence we are not in doubt as to correctness of our ultimate conclusion that petitioner's net income, if any, did not exceed the statutory exemption or exemptions allowable to her, leaving no net income to support respondent's determination. At the outset, it is to be noted that the respondent's agent in his "analysis" of petitioner's bank deposits overstated petitioner's deposits for 1946 by $57.53 and for 1947 by $59.84. A second error having to do with the amount of the bank deposits to be taken into account under the agent's "analysis" relates to an item of $1,643.52. According to his own determination, that amount represented the cost of a portion of the equipment for which petitioner became obligated under the conditional *138 sales contract. The fact that that much of the $6,000 for which she obligated herself under the said contract happened to pass through her hands could not in the circumstances properly enter into the agent's computation here since for all practical purposes she never had it, but had merely obligated herself to pay that amount at some time in the future as a part of the $6,000 covered by the said conditional sales contract. Rather obviously, the amount was a part of the deposit of $2,143.52 made in petitioner's bank account on November 2, 1946, and although it is obviously likewise included in the agent's computation under the item of $2,243.52, labeled "Loans from A F Butts," that inclusion implies that it was available for and used either for deductible expenses, in payment of nondeductible personal items, or in satisfaction of petitioner's obligations for capital items. The facts show that the passage of the $1,643.52 through her hands had no such effect since as to her there was no payment for the equipment except as she later paid Northern Finance Company. The agent's error was made all the more obvious when no credit was given for the checks issued against her bank account for *139 items later appearing in the conditional sales contract. Aside from the above item of $1,643.52 and the remainder of the amounts for which the agent did give credit under "Loans from A F Butts," the evidence shows with definiteness loans from Butts for which the agent in his computation did not give petitioner credit. Taking into account the repayments made by petitioner of such loans in 1946 and 1947 and the final payment by conveyance of the house in 1948, we are convinced that petitioner in the years herein had loans from Butts of at least $3,400 for which she was not given credit. Furthermore, from the details or breakdown of the loans to petitioner by Butts as given by the revenue agent in his oral testimony, there would appear to be some basis for concluding that in his computation he had understated such loans by even more than $3,400. We are also convinced that petitioner had other non-income items in the form of loans from others than Butts, from her brothers in the main, and from a fund left by her father for the benefit of her son from which the down payment on the residence, the amounts required for its renovation, and $5,000 in payments to Butts on the $6,000 loan *140 were paid. Furthermore, we are reasonably certain that at least $300, and very likely more than that amount, spent in the renovation of the residence was disbursed by checks and not from cash which did not pass through the bank account and for which the agent made no allowance. The agent in his report gave no credit for any amounts represented by checks paid to cash. And since most of such checks were for small amounts, were widely dispersed, and covered the period in 1946 when petitioner had no business, it is reasonable to conclude that the proceeds were used for non-deductible personal uses. We hold a contrary view, however, as to the proceeds of the November 2, 1946, check for $401.80. That check was cashed just as petitioner was opening the coffe shop and would need cash for incidental expenses pending the normally expected flow of business. It is our view that the proceeds of the check were so used. Other substantial errors in the agent's computation are in our opinion apparent in the limited amounts of the deductible items determined by him to have been paid by check. For the year 1947, he determined that petitioner's total bank deposits were $15,935.76. The bank ledger *141 sheet of petitioner's account shows that the entire amount of her deposits, including $198.40 in the account at the beginning of the year, had been disbursed during the year, except for a December 31 balance of $134.16. He allowed, however, only $6,997.77 as the expense items paid during the year by check, which would thereby indicate a conclusion by him that the remaining $10,001.23 which had been disbursed by check had been disbursed for personal, capital or other nondeductible items. From our examination of the evidence, we are convinced that the amount allowed as disbursed by check for deductible items should have been at least $10,450, instead of the $6,997.77 which was allowed. This is indicated by the aggregate of the many checks which were issued in payment for produce and other food supplies, salaries and wages of personnel, utility costs, and the like. Even that increased amount of expense items paid by check would leave approximately $5,600 which was expended during the year for personal, capital or other non-deductible items. We are convinced that of that amount, however, no less than $3,500 was for expense items in the nature of supplies and expendable equipment and for *142 capital items connected with the operation of the coffee shop. Similarly, we think at least $2,000 was expended in 1946 in similar circumstances. As to 1947, it is thus apparent that it makes little difference whether the amounts were expended for expense items or capital items since the entire stock of coffee shop equipment and fixtures was sold in November of 1947 for $9,100, and any increased amounts which were actually paid for capital items over and above the cost used by petitioner in computing her loss on the sale would merely go to increase the amount of the deductible loss so sustained over and above that which was claimed by her on her 1947 return and allowed by the respondent in his determination. With respect to capital purchases, one other matter may be mentioned. The agent in making his computation for 1947 concluded that petitioner had expended $1,575.90 for equipment from cash which did not pass through her bank account. In explanatory statements attached to the tabulation which appears in our findings of fact, the agent listed the individual items of equipment claimed to have been so purchased and the amounts the petitioner was supposed to have paid therefor. Petitioner *143 testified that items in that list having a purported aggregate cost of $858.50 were never at any time acquired or owned by her. The revenue agent testified that he had taken these items and the purported cost from a list of the equipment sold by petitioner in November of 1947, when she disposed of the restaurant. Petitioner in her testimony pointed out that in her copy of the contract of sale, which is in evidence, no such items appear. Furthermore, it follows that even if petitioner had owned and sold those items of equipment along with other equipment, as the agent concluded she did, it would have been incumbent upon him in making a correct determination of her net income to have increased her deductible loss from the sale of the restaurant by the same amount. In line with the above, we have concluded and found that petitioner's net income for each of the years 1946 and 1947, if any, would not exceed the statutory exemption allowable to her. It follows, of course, that there are no deficiencies in tax, and certainly no additions for fraud may attach to non-existent deficiencies. We have also concluded and found as a fact that petitioner's failure to file a timely income tax return *144 for 1947 was due to reasonable cause and not to willful neglect. Decision will be entered for the petitioner. Footnotes
1. As to 1946, the purchases and business expenses allowed by the agent with respect to the Summit Grocery were taken from the petitioner's original return, but as to the coffee shop, were taken from her amended return.↩